# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RONALD DESIMONE, | ) |
| | ) |
| Plaintiff, | )  Case No. 17-cv-5232 |
| | ) |
| v. | )  Judge Robert M. Dow, Jr. |
| | ) |
| DANAHER CORPORATION, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendants' motion to enforce settlement [85] is denied. This case is set for further status hearing on December 13, 2019 at 9:30 a.m. The parties are directed to meet and confer and to file on the docket no later than December 10, 2019 a joint status report indicating (1) how they propose to proceed with the parallel Illinois and Michigan cases (including whether one will be stayed or dismissed) and (2) if they propose to proceed here in Illinois, a detailed plan for any further discovery and dispositive motions and whether they have mutual interest in trying to resume settlement discussions to avoid further litigation costs.

**I.  Background**

The issue before the Court illustrates some of the challenges associated with bringing hotly contested litigation to a close. Plaintiff Ronald Desimone has not worked for Defendants since October 2015. Following his termination, Plaintiff filed charges of discrimination against Defendants with the U.S. Equal Employment Opportunity Commission in April 2016. The parties agreed to mediate the dispute at the EEOC's Chicago offices. The mediation lasted three days in October, November, and December 2016 and involved Plaintiff, his attorney, two attorneys for Defendants, plus a corporate representative for Defendants and, of course, the mediator. On the

first day of the mediation, the parties signed a "Confidentiality Agreement," which provided (among other things) that "[i]f a settlement is reached by all the parties, the agreement shall be reduced to writing and when signed shall be binding upon all parties to the agreement."

As the Court's prior twenty-four page memorandum opinion and order [68] sets out in detail, the parties began to converge on the terms of a final agreement on the afternoon of the third day of the mediation, December 1, 2016. The testimony at the evidentiary hearing confirms that agreement on the monetary terms was reached while Plaintiff was present, but that the lawyers went back and forth on some non-monetary terms late into the afternoon, after Plaintiff (unbeknownst to even his own attorney) had left for the day. Plaintiff's attorney had taken a hand at drafting a document entitled "Binding Term Sheet," which included at the bottom signature lines for Plaintiff and Defendants' corporate representative (as principals) and the EEOC Mediator (as a witness). At 4:17 p.m., Plaintiff's counsel conveyed the first version of the term sheet, along with an email indicating his belief that he had "captured the material terms and left room to add the other standard terms that would normally accompany such an agreement." A little more than an hour later, counsel for Defendants responded by email with "a revised term sheet" that included (among other changes) the addition of a Michigan choice of law and venue provision and retained the same signature lines. About half an hour later, Plaintiff's counsel sent the final version of the day in redline, indicating some concern about the choice of law and venue provision but stating that "[a]ll other looks good to us and we will work with client tomorrow to have signed." By that time, it was apparent that Plaintiff did not intend to return to the mediation, so Plaintiff's lawyer and one of the lawyers for Defendants signed the term sheet at a random spot on the back page. None of the actual signature lines—for Plaintiff, Defendants' corporate representative, and the EEOC mediator—were signed.

Almost three years later, the dispute remains unresolved. That state of affairs has spawned two lawsuits, one here and the other in the Western District of Michigan, the history of which is spelled out in the Court's prior decision and will not be repeated here. In essence, Plaintiff claims that the EEOC process did not yield a final settlement and asserts that he would like to litigate the matter. Defendants say that Plaintiff suffers from "buyer's remorse" and ask that the Court find that the signed term sheet constitutes a binding and enforceable settlement. After the Court concluded that it could not resolve the matter on the basis of briefing alone, it held an evidentiary hearing at which all of the actors present at the mediation except for the mediator herself testified. For the reasons explained below, the Court concludes that there was no meeting of the minds on all of the essential terms of the proposed agreement and thus the motion to enforce settlement must be denied.

Settling hotly contested cases such as this one is arduous work. Perhaps none of those involved anticipated needing three days to reach a resolution of the dispute arising out of an employment relationship that lasted less than a year. And the evidence is clear that nobody—not even Plaintiff's own lawyer—realized that Plaintiff was not returning to the mediation late in the afternoon of its third day, and instead had taken a train home after leaving to attend a meeting. One reason that mediators (and judges) require the presence (or at least the availability by phone) of principals is to obtain input at critical junctures, and in this unfortunate instance Plaintiff was not available to provide either input or potentially a decision on the terms that had been proposed at the end of the third day of negotiations.

On the basis of the parties' written submissions, including the documentary record, and the testimony elicited at the evidentiary hearing, the Court finds that the following state of affairs existed as of 6:00 p.m. on December 1, 2016:

3

- Counsel for both parties had negotiated a "Binding Term Sheet" that they believed contained the material terms of an agreement;

- The non-monetary terms of the proposed agreement were negotiated throughout the last day of the mediation and it took approximately 90 minutes of back-and-forth on redlined drafts before they were fixed on the Term Sheet;

- Given that negotiating process and the revision of proposed terms, any offers made by either side had been met with counteroffers until the final Term Sheet was signed at the end of the mediation session, and only that document constituted a live offer when the session concluded;

- The non-monetary terms were significant and thus material;

- The lawyers on both sides felt that the monetary and non-monetary terms were fair and would recommend that their clients accept them;

- Plaintiff's counsel had flagged one term (the Michigan choice of law and venue provision) that he thought might be problematic;

- Plaintiff had left the mediation hours before the final draft Term Sheet was available;

- As of the end of the day, the lawyers for Defendants knew that Plaintiff had left the mediation prior to the final draft of the Term Sheet becoming available;

- Plaintiff had never seen any of the provisions of the Term Sheet, much less all of them, on the final day of the mediation;

- Counsel for Defendants knew that Plaintiff had not been apprised of the contents of the Term Sheet;

- None of the principals signed the Term Sheet, either at the mediation or at any other time;

- The mediator never signed the Term Sheet;

- A lawyer for each side did sign the Term Sheet, but not on the lines included for their principals;

- The Confidentiality Agreement executed at the outset of the litigation contemplated that any settlement would be reduced to writing and signed, but it did not specify whether the signatures would be by the parties or their lawyers;

- Plaintiff's counsel testified that, at the end of the December 1 mediation, he told Defendants' counsel that there would not be a deal without Plaintiff's approval and signature, but Defendants' counsel testified that she did not hear any such statement.

4

The Court further finds the following relevant events to have taken place subsequent to the December 1 mediation session:

- Defendants' counsel asked on several occasions whether Plaintiff had signed the Term Sheet;

- Counsel for Plaintiff consistently communicated that his client had not signed the Term Sheet;

- Defendants never tendered a payment or took any step to convey to Plaintiff any other benefit under the Term Sheet;

- Plaintiff applied for a job with one of the Defendants, Leica, despite the provision in the Term Sheet that prohibited him from applying for or accepting employment with Leica or any other Danaher company;

- Plaintiff listed on his resume a position as an "Industrial Product Portfolio Manager" with X-Rite—a position he did in fact hold until his termination in October 2015;

- Plaintiff had a telephone interview for a position at Leica with Mistie Enriquez;

- Plaintiff told Ms. Enriquez that the resume was "old"; both his testimony and her notes from the interview reflect that Plaintiff's employment with X-Rite ended in October 2015, as did Plaintiff's full job application;

- Plaintiff told Ms. Enriquez that he had performed some 1099 contract work since leaving X-Rite; according to Plaintiff's testimony, he did not mention the company for whom he had done the contract work, and Ms. Enriquez's notes mention 1099 contract work that ended in June 2017, but do not identify any specific company; and

- Ms. Enriquez was "very impressed" with Plaintiff during the interview and he was her "number one candidate," but Plaintiff did not get the job.

**II. Discussion**

It is elementary that a "meeting of the minds" is an element of contract formation. *Bauer v. Qwest Communications, LLC*, 743 F.3d 221, 227 (7th Cir. 2014) ("Under Illinois contract law, a binding agreement requires a meeting of the minds or mutual assent as to all material terms."); see also *Baker O'Neill Holdings, Inc. v. Massey*, 403 F.3d 485, 488-89 (7th Cir. 2005) (holding that contract that did not evidence "meeting of the minds" not enforceable under Michigan law).

Based on the foregoing factual findings, it is evident that no meeting of the minds occurred here. Plaintiff left the mediation while certain material, non-monetary terms remained the subject of negotiation. Because Plaintiff had neither seen, nor approved, nor manifested his authorization to be bound to all material provisions set out in the Term Sheet, he had neither given his express authorization to his own lawyer or to Defendants nor made a showing of apparent authority in regard to accepting its contents. When the final terms were presented to Plaintiff in the days following the mediation, Plaintiff balked at signing the final agreement and to this day never has done so. In many ways, this has presented an unfortunate scenario, with lots of satellite litigation in two federal courtrooms across two states. The written record, briefing, and testimony all make clear that Plaintiff's lawyer both expected Plaintiff to sign the final Term Sheet and recommended that he do so. Defendants' lawyers no doubt had every confidence that Plaintiff would follow that advice, even if he did so reluctantly and perhaps even after a fair bit of cajoling. In the Court's experience, in the vast majority of cases where the monetary terms of a settlement are agreed and the lawyers for both sides recommend a deal, the case quickly resolves. But not always. Another elementary precept of law is that the client, not the lawyer, ultimately calls the shots—including (and perhaps especially) in regard to the termination of litigation. That everyone (except Plaintiff) was surprised about the final (failed) outcome of the mediation does not give the Court license to find an agreement where the evidence falls short of demonstrating a meeting of the minds on all of the material terms of the deal. When the Term Sheet was first shown to him in every detail, it was Plaintiff's prerogative to walk away.

Given the Court's finding that there was no meeting of the minds in regard to the Term Sheet on October 1, the Court need not determine whether Plaintiff's signature was a condition

precedent to a binding agreement.[1]  Thus, there is no need to resolve whether Attorney Roeser did in fact communicate to Attorney Mendez that Roeser needed to obtain Plaintiff's approval and signature.  Both credibly testified to different versions of the conversation on that point, and there is no contemporaneous written record, such as a follow-up email or even attorney notes from that day.  Perhaps Mendez did not hear what Roeser said, but the Court has no reason to further speculate because it is immaterial to the disposition of the instant motion.

Defendant's ratification argument also misses the mark.  According to the Restatement, ratification is the affirmance of a prior unauthorized act done by an agent.  RESTATEMENT OF THE LAW AGENCY, §4.01.  It "occurs when the party to be charged with ratification clearly evinces an intent to abide and be bound by the agreement." *VC Management, LLC v. Reliastar Life Ins. Co.*, 195 F. Supp. 3d 974, 994 (N.D. Ill. 2016) (emphasis added).  A principal can ratify his agent's actions either by not repudiating them or by accepting their benefit." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004).  However, there must be actual "benefit" conferred upon the party for there to be ratification.  Thus, "[i]f there is no benefit, ratification will not be implied." *Horwitz v. Holabird & Root*, 212 Ill.2d 1, 15 (Ill. 2004).  And the party alleging ratification bears the burden of proving its existence.  *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 678 (7th Cir. 2004).

As an initial matter, Defendant does not contest that the signals from Plaintiff's camp in the days and months after the mediation indicated repudiation, rather than ratification, of the Term Sheet.  Defendant repeatedly inquired about the status of the document—and, in particular,

---

[1] The Court acknowledges it previously identified "whether the parties, through their objective words and conduct, manifested an intent to make the parties' signatures a condition precedent to the enforcement of the Term Sheet" as "the critical issue."  [See 68, at 20.]  This highlights the extent to which the case has evolved as the parties have presented over time additional layers developing the factual picture on the third day of the mediation.

7

whether Plaintiff had signed it. Plaintiff's counsel responded in the negative in regard to the awaited signature, but expressed hope (at least at the outset) that his client would come around. But at least until Plaintiff applied for a job with Leica (a Danaher affiliate), his conduct since the end of the mediation indicated nothing but dissatisfaction with the Term Sheet, which he never did sign and return to Defendant. To that same end, Plaintiff's decision to apply for a job with Leica is consistent with his repudiation, not ratification, of the Term Sheet. After all, the Term Sheet forbade Plaintiff from applying to or working for any Danaher company, including Leica.

In the end, Defendant's ratification argument boils down to the premise that, notwithstanding Plaintiff's stonewalling with respect to signing the Term Sheet since December 2016, he accepted the deal in July 2017 by telling his interviewer at Leica (Ms. Enriquez) that he was an X-Rite contract worker. Even if this argument had some surface plausibility on the basis of Plaintiff's submission of what he testified was an "old" resume indicating that Plaintiff was still an "Industrial Product Portfolio Manager" with X-Rite, both Plaintiff's testimony and Ms. Enriquez's contemporaneous notes indicate that Plaintiff told her that his employment in that position ended in October 2015. In any event, as Plaintiff notes, Defendant's ratification argument rests on the far-fetched premise that Plaintiff thought he could take advantage of one term of the Term Sheet – that he could represent that he had an X-Rite consulting agreement – while disavowing another provision – that he was not permitted to apply and work for any Danaher company, including Leica. As the testimony showed, the hiring personnel at Leica easily could have discovered that inconsistency, and indeed every aspect of Plaintiff's prior employment with the Danaher family of companies. Defendant therefore has not carried its burden of showing that Plaintiff even tried to avail himself of even the smallest "benefit" of the Term Sheet—namely, the opportunity to represent that he was a contract worker with X-Rite (as opposed to some other

8

company, such as Sumitomo or TJS, as Plaintiff testified. Nor has Defendant shown that Plaintiff accepted any other benefit proposed under the Term Sheet.

In sum, given the absence of a "meeting of the minds," no contact was formed. Defendant's contention that Plaintiff's position in this litigation reflects "buyer's remorse" thus is premature, as the evidence does not indicate that Plaintiff ever actually bought a final resolution of this litigation. Instead—after much expense to resolve the extended motion to enforce interregnum—the litigation will move forward. And when it terminates, as it will, the parties can again consider whether what they almost had on December 1, 2016 was better or worse than what they get (or do not get) in the end.

Dated: November 26, 2019

_____
Robert M. Dow, Jr.
United States District Judge